IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BROWNING-FERRIS INDUSTRIES & SUBSIDIARIES | ) | |
| Plaintiff, | ) | No. 05-738 T |
| vs. | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF DALE PARKER, CPA

BROWNING-FERRIS INDUSTRIES & SUBSIDIARIES 30(b)(6)

Phoenix, Arizona
October 18, 2006

CD ENCLOSED

**ARIZONA REPORTING SERVICE, INC.**
Court Reporting
Suite Three
2627 North Third Street
Phoenix, Arizona 85004-1126

By: JODY L. LENSCHOW, RMR, CRR
Certified Reporter
Certificate No. 50192

Prepared for:

Mr. Stuart J. Bassin
Attorney at Law

CERTIFIED COPY
(When in red)

INDEX TO EXAMINATIONS


| WITNESS | PAGE |
|---|---|
| DALE PARKER, CPA | |
| Examination by Mr. Bassin | 5 |


INDEX TO EXHIBITS


| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 22 | 1997 BFI, Inc. Form 1120 top page | 14 | 14 |
| 23 | 1998 BFI, Inc. Form 11209 top page | 16 | 16 |
| 24 | 12/31/2004 Unanimous Written Consent of the Board of Directors of BFI, Inc. | 22 | 22 |
| 25 | Delaware Certificate of Conversion | 27 | 27 |
| 26 | 2004 Allied Form 1120 excerpt | 32 | 32 |
| 27 | 7/27/2000 BFI, Inc. Form 1139 | 39 | 39 |
| 28 | BFI, Inc. Form 1120X for tax year ending 9/1998 | 41 | 41 |
| 29 | 4/25/2005 letter from Mr. Parker to Mr. Mastracchio | 42 | 42 |

OTHER PREMARKED EXHIBITS REFERRED TO HEREIN

| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 | 30(b)(6) Notice of Deposition | 5 |
| 2 | Notice of Deposition of Dale Parker | 5 |
| 5 | BFI, Inc. Form 1120X for tax year ending 9/30/1997 | 46 |
| 6 | BFI, Inc. Form 1120X for tax year ending 9/30/1998 | 46 |
| 7 | BFI, Inc. Form 1120X for tax year ending 9/30/1999 | 46 |
| 8 | 5/5/2005 letter to Mr. Mastracchio from Winston & Strawn | 48 |
| 9 | BFI, LLC Form 1120X for tax year ending 9/30/1997 | 49,70 |
| 10 | BFI, LLC Form 1120X for tax year ending 9/30/1998 | 49,70 |
| 11 | BFI, LLC Form 1120X for tax year ending 9/30/1999 | 49,70 |
| 12 | BFI Waste Form 1120X for tax year ending 9/30/1997 | 49,70 |
| 13 | BFI Waste Form 1120X for tax year ending 9/30/1998 | 49,70 |
| 14 | BFI Waste Form 1120X for tax year ending 9/30/1999 | 49,70 |
| 18 | Allied Waste Form 10-K | 25,48 |
| 19 | Amended Notice of Deposition | 49 |

DEPOSITION OF DALE PARKER, CPA

was taken on October 18, 2006, commencing at 9:52 a.m., at the Offices of the United States Attorney, Two Renaissance Center, 40 N. Central Avenue, Suite 1200, Phoenix, Arizona, before JODY L. LENSCHOW, Certified Reporter No. 50192 for the State of Arizona.

APPEARANCES:

For the Plaintiff:

MILLER & CHEVALIER
By Mr. Philip Karter
300 Conshohocken State Road
West Conshohocken, Pennsylvania 19428

-and-

ALLIED WASTE INDUSTRIES, INC.
By Mr. Joseph Sciarrotta, Jr.
Managing Corporate Counsel
15880 N. Greenway-Hayden Loop
Suite 100
Scottsdale, Arizona 85260

For the Defendant:

U.S. DEPARTMENT OF JUSTICE
By Mr. Stuart J. Bassin
and Mr. Jacob E. Christensen
Tax Division
Room 7203
555 Fourth Street, N.W.
Washington, D.C. 20001

DALE PARKER, CPA,

called as a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. BASSIN:

Q. We're on the record. We're here today for two depositions, the 30(b)(6) deposition of the plaintiff, as well as the personal, which is in the premarked exhibits as a Government Exhibit 1. There is an amended notice, which is Government Exhibit 19. We also are here for the personal deposition of Dale Parker, which is marked as Exhibit No. 2.

MR. BASSIN: Do we have any objection to doing them as a combined exercise?

MR. KARTER: No objection.

MR. BASSIN: We're going to assume that Mr. Parker is the designee?

MR. KARTER: Correct, for the items listed in the 30(b)(6) deposition notice, other than the Item i).

MR. BASSIN: Correct.

BY MR. BASSIN:

Q. Mr. Parker, I would like to go through a couple

preliminaries before we start.
Have you given depositions before?
A. Yes.
Q. In what context?
A. Two with my work at Allied.
Q. What kind of depositions?
A. There was a lawsuit brought against Allied by a company called Power Strategies, so I participated in that; and then one deposition by the IRS associated with our contingent liability transaction, or, sorry, contested liability transaction.
Q. Is that the same transaction as the one that's ensued here?
A. No.
Q. What contested liability?
A. It's a contested liability transaction.
Q. Do you know who the lawyer was who handled that?
A. I think it was handled all by the exam team with the attorney from the local IRS office there.
Q. John Duncan?
A. Yes, correct.
Q. For your reference, we use a question-and-answer format in the deposition. We ask you to answer as clearly and as fully and as accurately as possible. You're under oath. There's a court reporter taking stenographic notes

here. There will be a transcript, which you'll want to review?

MR. KARTER: We'll --

MR. BASSIN: Will he want to review?

MR. KARTER: We'll decide that at the end of the deposition.

BY MR. BASSIN:

Q. It's as though you were in a courtroom for your purposes. Because we have a court reporter, there are three things that I think are important. Number one, we will have a number of documents here that we'll be referring to. It's important to refer to them by exhibit number and page number, so that a month from now we will know what document you are actually referring to.

A. Okay.

Q. And we'll assist you, and you try to watch yourself as well. I think virtually every page has a page number on it.

Second thing is, audible answers are real important. If you shake your head now, I'll understand what you're saying, but the record won't show anything.

A. Uh-huh. Just like that. Okay.

Q. Exactly. And I've found that my uh-huhs and huh-uhs are really embarrassing and confusing when I see them on a transcript. Okay. The only other thing is, we

can only speak one at a time, because our fine court reporter will short-circuit if three of us are talking at once and she's trying to write it all down.

From a scheduling standpoint it's about 10:00 a.m. right now. My guess is that we have something under three hours' worth of work to do here. We'll try to take a break, say about an hour and a half. If you need a break, let us know, we'll take one. If we get to a point where you need to be fed lunch, let us know, we'll work on that.

A. Okay.

Q. Any questions before we get started?

A. No.

Q. If any develop, let me know, and we'll try to get them clarified. We're not trying to trick you. We're just trying to get your view of the facts as clearly and as accurately as possible.

For the record, we have premarked I think Exhibits 1 through 20. They are in the binder, and they have been handed -- and there were a couple of them that were added during Ms. Kuether's deposition. There's also an index, and we'll refer to them from time to time.

Mr. Parker, can you summarize your educational experience after high school?

A. I have an undergraduate degree, Bachelor of

Science in business management.

Q. From where?

A. BYU, and then a Master's of accounting from BYU.

Q. What years?

A. You make me go way back here, Stu. 1979 for the B.S. degree in business and 1983 for the Master's degree in accounting.

Q. That isn't so far. Those are the same years of my degrees. Okay, do you hold any professional licenses?

A. Yes. I hold a CPA.

Q. Any others?

A. No.

Q. From the time that you got your Master's degree, can you summarize your professional experience?

A. About six years in public accounting. Following that, about six years in two different industry jobs and then the last eleven years with Allied Waste.

Q. The industry jobs are about 1990 through about 1995?

A. Correct.

Q. What were the employers?

A. First employer was Bell Atlantic Systems Leasing Company and the second employer was Walsh America.

Q. What kind of company is Walsh America?

A. It was a pharmaceutical information company.

Q. And then in 1995, roughly, you went to work for Allied?

A. Correct.

Q. What was your first position at Allied?

A. Tax director.

Q. What were your duties as tax director?

A. Primarily, initially was compliance-related. Allied did not have a tax department. I was the first tax employee.

Q. At the time, who did their tax planning and advisory function?

A. Primarily Arthur Andersen.

Q. Who were the people at Arthur Andersen '95 through, say, '99 who worked the account primarily?

A. First couple of years, primarily Tray Maxwell is his name; and then the partner after that was Dean Bakke.

Q. How is his last name spelled?

A. B-A-K-K-E.

Q. Was there a time after '95 where your duties at Allied started to expand or change?

A. Sure.

Q. Can you explain how it changed and when?

A. Maybe be a little bit more specific. Help me with your question.

Q. Did your title change at some point?

A. I believe at the end of 2002, was made vice president of tax.

Q. What was the difference between your duties as tax director and as vice president of tax?

A. Initially when I started with Allied, like I indicated, it was more compliance-driven, and then further into Allied, still had compliance responsibilities, but then involved in tax planning.

Q. When did you start becoming involved in tax planning?

A. To a certain extent, even from day one with Allied. The return had been outsourced to Arthur Andersen, so my initial couple years was getting familiar with the compliance process, getting more familiar with the company.

Q. Did the tax function grow during this period, say, from 1995 through 2002 in terms of number of people employed there?

A. Yes.

Q. In what ways did it change?

A. Hired a tax manager. Again, you're testing my memory here, but by the end of 2002, maybe had ten people in the tax department, nine to ten.

Q. And you were on top?

A. Correct.

Q. Throughout this period?

A. Correct.

Q. Who were some of those -- who were the other professionals in that group by 2002?

A. At the end of 2002, Ann Couture, C-O-U-T-U-R-E, was tax manager. I'm trying to remember a few of the other names at that point in time. There was a couple of staff people. I believe by that time we had hired a State tax manager by the name of Jeff Stair. That's about the best I can do off the top of my head.

Q. We know that in 1999 there was a merger with Browning-Ferris Industries.

A. Correct.

Q. After that merger, what was done for taking care of the historic Browning-Ferris Industries' tax issues?

A. What do you mean by what was done?

Q. Okay. Prior to the merger, who was responsible for Browning-Ferris Industries' tax compliance and planning?

A. Rich Howe. He was the director of tax for BFI.

Q. And what happened after the merger?

A. It became a process of my becoming familiar with BFI, and it was an integration process. So I worked closely with Rich Howe and the members of his staff.

Q. Who were the other principal members of his

staff?

A. Walt Stone worked with Rich. He was primarily in treasury at the time, but he had previously been in the tax department so had some tax knowledge. Terri Page was one of the managers under Rich Howe; Ann Smith, another manager under Rich Howe; and then he had about three or four staff.

Q. Where were these people located?

A. In Houston.

Q. Did they ever come to Phoenix?

A. I don't believe so.

Q. At what point -- well, are any of them still employed by Browning -- or by Allied?

A. Terri Page is still -- not employed. She's a consultant for Allied.

Q. At what time did any of the others depart the combined company?

A. Again, you're asking for my best guess?

Q. Right.

A. Rich Howe --

MR. KARTER: Don't guess. If you recall, state what your recollection is.

THE WITNESS: Best of my recollection, about a year for Mr. Howe and about a year and a half, two years for Mr. Stone.

BY MR. BASSIN:
Q. So by the beginning of about 2002, they were both out?
A. Approximately, yes.
Q. What about Ann Smith?
A. She stayed as a consultant for a period of time; and correct a prior statement, Walt Stone stayed as a consultant for a period of time as well.
Q. Do you know where they are now?
A. I know where Walt Stone is.
Q. Where?
A. Houston.
Q. What about Rich Howe?
A. I'm not sure.
Q. Have you had occasion to become familiar with the tax returns that were filed for the BFI Consolidated Group for the last couple years before the merger?
A. Yes.
Q. I would like to start with the tax return for the year ending September 30, 1998. We're up to Exhibit 22.
(Deposition Exhibit No. 22 was marked for identification.)
BY MR. BASSIN:
Q. I would like you to look at Exhibit 22. Can you

tell me what Exhibit 22 is?
A. Page 1 of the 9-30-98 consolidated tax return for BFI.
Q. Can you tell me whose signature that is?
A. No.
Q. Now, a couple basic questions about this return. Was this a single company or a consolidated return?
A. Consolidated return.
Q. And the name of the entity that was filing was Browning-Ferris Industries, Inc.?
A. Correct.
Q. With the EIN, employer identification number, of 74-1673682?
A. Correct.
Q. Are you familiar with the process whereby Browning-Ferris Industries, Inc. had obtained the consent or authorization of the members of the group, its subsidiaries, to file the consolidated return on behalf of the group?
A. No.
Q. Do you know if there was any kind of tax sharing agreement amongst the various members of the Browning-Ferris Industries, Inc. Consolidated Group?
A. I don't know.
Q. Let's go to Exhibit 23.

(Deposition Exhibit No. 23 was marked for identification.)

BY MR. BASSIN:

Q. Can you tell me what Exhibit 23 is?

A. The consolidated tax return for Browning-Ferris Industries, Inc. and subs for the short year ended July 30th, 1999.

Q. Do you know whose signature that is as the person who signed the return?

A. Are you talking about the officer or the paid preparer?

Q. The officer.

A. I don't know.

Q. What about the paid preparer; do you know who that was?

A. Yes.

Q. Who was that?

A. Teresa Dieguez.

Q. Any idea how to spell that?

A. I believe it's D-I-E-G-U-E-Z.

Q. Do you know if there was any change in the composition of the group, of the BFI Group, that reported the tax on Exhibit 23?

A. Change from --

Q. The prior year.

A. I don't know of any.
Q. To your knowledge, has there ever been -- well, was there ever, prior to the current controversy, been any question regarding the authorization of Browning-Ferris Industries, Inc. to file returns for this group, prior to the current controversy?
A. Not that I'm aware of.
Q. Now, after the BFI/Allied merger, do you know how the income earned by the former Browning-Ferris Industries Consolidated Group was reported to the Internal Revenue Service for postmerger years?
A. Yes.
Q. Can you explain how that was done?
A. It was included in the Allied Consolidated Group tax return.
Q. And that's for the first year after the merger?
A. It's for the period July 31st, '99 through the end of the year and then forward.
Q. Are there any separate Form 1120 returns filed by Browning-Ferris Industries, Inc. for any period after July 30, 1999?
A. No.
Q. What was the process whereby the members of the old Browning-Ferris Industries Consolidated Group indicated their consent to be part of the Allied

consolidated return and to file on that, if there was any?
A. I don't know of any consent, any process that was gone through.
Q. Is there any kind of a tax sharing agreement amongst the members of the Allied Consolidated Group?
A. No.
Q. Was there any change made prior to the current controversy regarding Browning-Ferris Industries' role as the head of the Browning Consolidated Group for premerger years?
A. Repeat the question for me, Stu.
Q. Prior to the current controversy, was there any change that you're aware of made regarding Browning-Ferris Industries' role as the head of the Browning Consolidated Group for tax purposes for premerger years?
A. No, that I'm aware of.
Q. Let's shift gears a little bit.
Do you know when the first time you heard about the possibility that the old Browning-Ferris Industries, Inc. might be restructured as a Delaware LLC, limited liability company?
MR. KARTER: Object to form.
MR. BASSIN: Is your objection to the term "restructured" or --
MR. KARTER: Correct, and then, also, with

regard to he heard. Both assume certain facts that aren't in evidence.

MR. BASSIN: Okay.

BY MR. BASSIN:

Q. What was your first awareness of the possibility that the old Browning-Ferris Industries, Inc.'s corporate structure might be changed?

A. We started talking about some State tax planning opportunities.

Q. When was this?

A. Give or take, summer of '04.

Q. What kind of State tax planning opportunities were you discussing?

A. The opportunity was trying to reduce our cash taxes that we were paying on behalf of the BFI North America entity.

Q. And how did a change of the old Browning-Ferris Industries, Inc. corporate structure fit into that potential opportunity?

A. It was a step in providing a way for the income of BFI North America to flow up into Allied Waste North America.

Q. Can you explain how that would work? Excuse me. Can you explain how you thought that would work?

A. If we could get the income within BFI North

America to flow up into Allied Waste North America, Allied Waste North America is the entity with all the debt of the company, and it had losses, so to the extent we could get income matched with those losses, cash taxes would be reduced.

Q. And is this a State tax issue or a Federal tax issue or both?

A. State.

Q. And how did you think you could accomplish that matching of income and losses through the restructuring or through the modification of the BFI, Inc. corporate structure?

A. Again, the losses were in Allied Waste North America. It owned 100 percent of BFI, Inc., and BFI, Inc. owned BFINA, BFI North America. The only way that you're going to get that income to flow up is if you have a liquidation of BFI North America and then a liquidation of BFI, Inc.

Q. You're using the term "liquidation." I've also seen the terms "dissolution" and "termination." Can you explain what the relationship, if any there is, between those terms?

A. I can explain for tax purposes it was a liquidation under Section 332.

Q. Of the Internal Revenue Code?

A. Correct.
Q. What was a liquidation for Section 332 of the Internal Revenue Code?
MR. KARTER: Are you asking him to explain what 332 is?
BY MR. BASSIN:
Q. No. What event did you understand would create a liquidation for purposes of Section 332 of the Internal Revenue Code?
A. With respect to?
Q. BFI, Inc.
A. A conversion to a single member LLC.
Q. Did that have anything -- strike that.
Did such a liquidation have anything to do with what happened to BFI, LLC -- can you change LLC to Inc.? Did such a liquidation have anything to do -- strike that.
MR. KARTER: The transcript says what it says.
BY MR. BASSIN:
Q. Did such a liquidation have anything to do with what happened to BFI, Inc. for State corporate law purposes?
MR. KARTER: I'm sorry, would you mind repeating the question?
THE WITNESS: For me, too.

BY MR. BASSIN:
Q. Was there any connection between a liquidation for Federal income tax purposes of BFI, Inc. occurring and what happened to BFI, Inc. for State corporate law purposes?
MR. KARTER: I'm just going to object to the form. You can answer it if you understand the question.
THE WITNESS: I'm not an attorney. I know what it was for tax purposes.
BY MR. BASSIN:
Q. Were there any other benefits that you were aware of to changing BFI, Inc. to a limited liability company?
A. None that I was aware of.
Q. Our next exhibit is No. 24.
Handing you Exhibit 24.
MR. KARTER: Do you want to give him the original to give to the reporter?
MR. BASSIN: Jacob has it someplace.
MR. KARTER: I have no objection if you want to use this as the original.
MR. BASSIN: It isn't even marked. There you go.
(Deposition Exhibit No. 24 was marked for identification.)

BY MR. BASSIN:

Q. I would like to ask you -- well, have you seen Exhibit 24 before?

A. Yes.

Q. Let's start with on the third page, we have some signatures of the board of directors of Browning-Ferris Industries, Inc., Donald Slager, Thomas Martin and James Gray. Who are they?

A. Don Slager is currently our president/chief operating officer.

Q. When you say "our" --

A. Sorry, Allied's. At the end of '04, I'm not sure what his title was.

Thomas Martin was the treasurer at the time and James E. Gray was chief accounting officer/controller.

Q. There's a reference in the first whereas clause to a phrase that the company has entered into a restated indenture with JPMorgan Chase Bank, N.A. Do you know what that is?

A. It would be the bank credit agreement.

Q. What bank credit agreement?

A. And I'm not in treasury, but this would be in effect the line of credit, the -- a source of borrowing for Allied.

Q. What did Browning-Ferris Industries, Inc. have

anything to -- have to do with that line of credit?
A. It is Allied's line of credit. It's my understanding --
MR. KARTER: There's no question.
THE WITNESS: Okay.
BY MR. BASSIN:
Q. I think I'm getting a little confused here. In the first paragraph of Exhibit 24, they refer to Browning-Ferris Industries, Inc. as the company.
A. Uh-huh.
Q. And in the second paragraph in the whereas, it talks about the company, Browning-Ferris Industries, Inc., having entered into a restated indenture as of September 1, 1991 with certain banks. That's premerger date. I'm confused.
A. Right. I need to correct my previous statement. I'm not familiar. I don't know what that restated indenture is referring to.
Q. In the second whereas of Exhibit 24 on the first page, it says it is no longer desirable in the conduct of the business of the company to preserve the corporate status and that it is in the best interests of the company to convert into a limited liability company.
Do you know what determination the board made or what the basis for the board's determination was?

A. No.
Q. Did you have anything to do with advising the board of Browning-Ferris Industries, Inc. regarding whether to convert Browning-Ferris Industries, Inc. into a limited liability company?
A. Not that I can recall.
Q. Do you know who would, who did?
A. No.
Q. Did it have anything to do with what you described prior as the tax advantages, at least for State tax purposes, of converting into an LLC?
A. For tax purposes that's why we wanted to do it.
Q. Were you aware of any other purposes for wanting to convert BFI, Inc. into an LLC?
A. No.
Q. I would like you to look at Exhibit 18 in the binder, and this is the Form 10-K filed by Allied for the fiscal year ended December 31, 2005, and I would specifically direct your attention to what's labeled as Exhibit 149 or Page 149. On Page 149 -- are you there?
A. Uh-huh. I am.
Q. Under Section 9, Footnote 9 to the consolidated financial statements of Browning-Ferris, LLC, there's a paragraph there, and it says, "Effective for 2005, Browning-Ferris Industries, Inc. was converted to a single

member limited liability company (LLC). Allied NA, a wholly-owned subsidiary of the Allied Waste Industries, Inc., is the sole member in Browning-Ferris Industries, LLC and therefore BFI continues to be wholly-owned by Allied NA, which ownership has not changed since Allied acquired BFI in 1999."

To your knowledge, is that statement accurate?

MR. KARTER: Just for my own clarification, can we be clear, when it references BFI, which entity it's talking about now? I haven't looked at this prior to this, and I want to make sure I understand, because there's so many entities floating around and many of them have a BFI in them.

MR. BASSIN: Okay. Well, we are -- it's Allied's document, of course, so I -- but I think if you were to go forward in the document to Page -- if you go to Page 119, I think you'll get a -- you'll see the definition of Browning-Ferris Industries for purposes of these financial statements.

MR. KARTER: Browning-Ferris Industries, LLC.

MR. BASSIN: Is the short. BFI becomes the short form for Browning-Ferris Industries, LLC.

So if we go back to Page 149, that may help clarify.

THE WITNESS: So the question, again?

BY MR. BASSIN:
Q. Is the statement in Footnote 9 on Page 149 of Exhibit 18 accurate, to your knowledge?
A. Let me state what my understanding is.
Q. Please.
A. Allied North America owned all of the stock of BFI, Inc. through 12-31-04; and then when Inc. converted to an LLC, it was the sole member. It held the sole member interest in BFI, LLC.
Q. One other thing in -- let's go back to Exhibit 24. On the second page of Exhibit 24, in the last resolved, do you know why BFI, Inc. adopted as a resolution the particular terms shown in that final paragraph; that the company will not be required to wind up its affairs or pay its liabilities and distribute assets, and that the conversion shall not constitute a dissolution of the company and that shall constitute a continuation of the existence of the converted company in the form of a limited liability company of the State of Delaware?
Do you know why those terms were adopted?
A. No.
Q. Let's go next to Exhibit 25.
(Deposition Exhibit No. 25 was marked for identification.)

BY MR. BASSIN:
Q. Have you seen the documents in Exhibit 25 before?
A. Yes.
Q. When?
A. When I was reviewing certain documents in preparation for this deposition.
Q. The third and fourth pages, or the third and fifth pages of Exhibit 25 are dated December 2004. Do you recall having seen them at a date anywhere near December 2004?
A. I don't recall.
Q. Who is Jo Lynn White?
A. She was in the legal department for Allied Waste.
Q. On the fifth page, we have the certificate of formation that is dated as of December 31, 2004. Do you know what date Ms. White actually signed the document?
A. No.
Q. Does the phrase "dated as of" indicate the possibility that it wasn't actually signed on December 31st, 2004, to your knowledge?
MR. KARTER: Object to form, speculation.
BY MR. BASSIN:
Q. Do you know?

A. No.
Q. When we were looking at Exhibit 18, which was the Form 10-K, we were looking at financial statements, separate financial statements for BFI after it had merged -- several years after it had merged into Allied. Do you know why those financial statements were prepared and published as part of the 10-K?
A. I know it was required.
Q. For tax purposes?
A. My understanding, it was required for credit agreement purposes, but that's about all I know.
Q. Allied's credit agreement or BFI's?
A. I believe it was BFI's.
Q. Can you tell me what your understanding is of why it was that somebody required publication of BFI separate financial statements as of 2004, 2005?
A. It's my understanding they were BFI bondholders and that is what required -- or that is what required the separate BFI financial statements.
Q. So BFI had bonds that predated the merger; is that correct?
A. Correct.
Q. And that those bonds remained outstanding through 2004?
A. Correct.

Q. And as part of the terms of those bonds, separate financials for BFI had to be prepared even after the merger with Allied?

A. I don't know if it was the terms of the bonds or if it was an SEC requirement.

Q. Did the conversion from BFI, Inc. to BFI, LLC change the substance of those financial reports, other than the name at the top?

MR. KARTER: Object to form. When you say "substance" --

THE WITNESS: Yeah, what do you mean by substance?

BY MR. BASSIN:

Q. Do we zero -- were the accounts zeroed out, or did they just carry over the way they had always been as shown in those financial reports?

A. I don't know the specific changes, if any, that were made in the general ledger.

Q. Are you aware of any changes that were made?

A. No.

Q. Do you know if any specific notice was given to these bondholders that there had been a change of BFI from Inc. to BFI, LLC?

A. I don't know.

Q. Let's change the subject a little bit here.

We were talking about designations of agents for the consolidated -- for the BFI Consolidated Group. Now, let's make sure I have this correct. Prior to the merger and for premerger years, the designated agent of BFI, Inc. and the Consolidated Group was Browning-Ferris Industries, Inc. for Federal income tax purposes?

MR. KARTER: Did you say designated agent?

MR. BASSIN: Let me rephrase that.

BY MR. BASSIN:

Q. As of the date of the merger, was Browning-Ferris Industries, Inc. the agent for the Browning-Ferris Industries Consolidated Group for Federal income tax purposes?

A. It was the parent of the Browning-Ferris Industries group.

Q. Up until August 2006, are you aware of any action that was taken to change the identity of the agent for the Browning-Ferris Industries Consolidated Group for Federal income tax purposes for premerger tax years?

A. State it one more time, please.

Q. Up until August 2006, are you aware of any action that was taken to change the identity of the agent for the Browning-Ferris Industries Consolidated Group for Federal income tax purposes for premerger tax years?

A. No.

MR. KARTER: Stu, when we have a moment, can we take a short break?

MR. BASSIN: Sure. Why don't we take five minutes now.

(A recess was taken.)

BY MR. BASSIN:

Q. I would like to hand you what's labeled as Exhibit 26.

(Deposition Exhibit No. 26 was marked for identification.)

BY MR. BASSIN:

Q. Can you tell me what that document is?

A. Looks like a portion of Allied Waste Industries, Inc. and Subsidiaries' consolidated return for the calendar year '04.

Q. Would you have been the signatory on that?

A. Yes.

MR. BASSIN: Just to clarify, Mr. Karter, can we stipulate that this is -- these are documents off that CD that you sent us?

MR. KARTER: I'll take your word that they are. Obviously I don't know for certain, but if that's what you printed them off, then I'll stipulate that that's where they came from.

MR. BASSIN: Okay. Please advise us if you find

that they aren't.

MR. KARTER: Dale, is there anything about this that is inconsistent with your recollection of a piece of the 2004 return?

THE WITNESS: No.

MR. KARTER: Okay.

BY MR. BASSIN:

Q. Mr. Parker, there are handwritten numbers on the bottom of Exhibit 26 for page numbering purposes, and I'll admit -- I'll state that those are mine. But we'll start with Page 5.

Was this the document that Allied submitted to the Internal Revenue Service reporting the conversion of BFI, Inc. to an LLC?

MR. KARTER: Object to form. You said reporting the conversion to the IRS.

You can answer it, if you can.

THE WITNESS: It's the liquidation statement for BFI, Inc.

BY MR. BASSIN:

Q. Do you know if there was any tax effect for Federal income tax purposes to this associated with this complete liquidation?

A. What do you mean by tax effect?

Q. Did the amount of Allied's Federal income,