taxable income, or total tax due, was that altered in any way, to your knowledge, because of the complete liquidation of Browning-Ferris Industries, Inc.?

A. There's no tax gain or loss realized on the 332 liquidation.

Q. On Page 10 through, I guess, 14, of Exhibit 26, we have a statement regarding complete liquidation of Chestnut Equipment Leasing Corp. Is that another subsidiary that was altered during the tax year ended December 31, 2004?

MR. KARTER: Object to form.

BY MR. BASSIN:

Q. Let me rephrase that.

Do you know what happened to Chestnut Equipment Leasing Corp. during 2004 from a corporate law perspective?

A. From a corporate law perspective?

Q. Yeah.

A. No.

Q. On Page 13 of Exhibit 26, we have a certificate of dissolution for Chestnut Equipment Leasing Corp. Any knowledge about that entity and what happened?

A. From a tax perspective, the fact that this was attached to the 2004 return tells me that for tax purposes it was liquidated under 332.

Q. Now, on Page 13, does that show that you are a vice president of the corporation, of Chestnut?
A. It does.
Q. I notice that this is a certificate of dissolution, and it says, paragraph four, "The corporation elects to dissolve." Any knowledge as to why that company elected to dissolve for State law purposes?
A. No.
Q. Let's go on to Page 15 through 17. Is this a comparable statement regarding complete liquidation that was attached to the Allied 2004 tax return for an entity called City Garbage, Inc.?
A. Repeat the question again.
Q. Is this a statement regarding complete liquidation that was attached to the Allied 2004 tax return for an entity called City Garbage, Inc.?
A. That's what the statement shows, yes.
Q. Is that a comparable statement to the one that was submitted for BFI, Inc.?
A. Both are liquidations under Section 332.
Q. Do you know what happened to City Garbage, Inc. during 2004?
A. What do you mean by what happened?
Q. What happened from a corporate law standpoint?
A. And I can tell you from a tax point of view how

it was handled; but from a corporate law, I'm not an attorney.

Q. Well, from an operational standpoint, did City Garbage, Inc. continue to operate after 2004?

A. I don't know.

Q. Well, let's go back. Did Chestnut Equipment Leasing Corp. continue to operate after 2004?

A. I don't know.

Q. And you're an officer, you're listed as an officer for City Garbage, Inc.?

A. Correct.

Q. Let's go on to Pages 19 through 21. Do you know what Hollister Landfill, Inc. was?

A. Other than a corporation?

Q. Yes.

A. No.

Q. And we have a 332-6 liquidation comparable to what happened to BFI, Inc. for tax reporting purposes?

A. Correct.

Q. Do you know if Hollister Landfill, Inc. had any operations after December 31, 2004?

A. Let me correct a prior statement. With regard to whether this entity had any operation, the entities for tax purposes were liquidated, so Hollister Landfill, Inc. was liquidated, City Garbage, Inc. was liquidated, and

then Chestnut was liquidated. Where those assets and liabilities went, where those operations went is what I'm not sure of, but the corporations were liquidated for tax purposes.

Q. Do you know if these were converted to LLCs?

A. I don't know.

Q. Last one of these. Pages 22 through 24, Omaha Hauling Company, Inc., do you know anything about that entity, about Omaha Hauling Company, Inc.?

A. Again, other than it's a statement in the tax return and it's a corporation, or it was.

Q. Do you know if it had operations after December 31, 2004?

A. The Inc. would not have.

Q. Do you know if it was converted to an LLC?

A. I don't know.

Q. In Exhibit 26 we have a series of State-issued certificates of dissolution. Have you seen anything that constitutes a certificate of dissolution for Browning-Ferris Industries, Inc.?

A. Have I seen anything in this package you've given me?

Q. Right.

A. There is nothing in the package that is titled Certificate of Dissolution.

Q. Have you seen a certificate of dissolution for BFI, Inc.?
A. Not that I can recall.
Q. We're shifting gears a little bit here.
After the BFI/Allied merger, were there issues that arose between the Internal Revenue Service and BFI for premerger years?
A. Maybe clarify your question a little bit for me.
Q. Was there an audit for premerger years?
A. Yes.
Q. From the company standpoint, who handled the audit?
A. Which years are you referring to?
Q. Premerger years.
A. It would have varied, depending on the year you're talking about.
Q. Okay. Well, can you explain who handled what?
A. To the extent that there was involvement with the IRS premerger, we were not involved with BFI at that time at all, so it would all have been -- the relationship would have been between the IRS and the BFI employees.
Q. But I think you said at a certain point, it was the -- most of the senior BFI tax department employees had left the scene.
A. Uh-huh.

Q. Was there an audit for premerger years ongoing after those people had left the scene?

A. Yes.

Q. And who handled that from the taxpayer side?

A. Since BFI was now a member of the Allied group, it was coordinated through Allied.

Q. The next document I would like you to look at is No. 27.

(Deposition Exhibit No. 27 was marked for identification.)

BY MR. BASSIN:

Q. Have you seen that document before?

A. Yes.

Q. Can you tell me what it is?

A. It's a Form 1139 for carrying back a net operating loss.

Q. Does that net operating loss have anything to do with the contingent liability transaction that is part of the substantive dispute in this case?

A. What do you mean, has anything to do with?

Q. Well, is the loss that is being carried back at least in part the product of the contingent liability transaction?

A. There were capital gains in the 7-99 year for BFI, which were offset by capital loss, some of which came

from the contingent liability transaction.
Q. What about was there capital loss that was then carried back to the tax years ended September 30, 1997 and September 30, 1998?
A. Capital loss?
Q. Yes.
A. It was a net operating loss that was carried back.
Q. Okay. And that's attributable to the contingent liability transaction?
A. No, there are many items that make up that 145.9 million of net operating loss.
Q. Was the contingent liability transaction one of the items that made up the $145.9 million of net operating loss?
A. There was capital loss from the ERMI transaction claimed in coming up with the 145.9 million.
Q. And this Form 1139 is filed to obtain a tentative refund attributable to those losses?
A. Carried back to prior years, yes.
Q. Now, who were the signatories on this document?
A. The officer is G. Thomas Rochford.
Q. Who is G. Thomas Rochford?
A. He was the treasurer at the time.
Q. Of?

A. Of Allied.

Q. And I can't read the Arthur Andersen preparer name.

A. Lawrence Focazio.

Q. Was he associated with Allied or --

A. He was a manager with Arthur Andersen.

Q. I see. Okay. I would like you next to look at Exhibit 28.

(Deposition Exhibit No. 28 was marked for identification.)

BY MR. BASSIN:

Q. Tell me what Exhibit 28 is.

A. Form 1120X, amended U.S. Corp. income tax return.

Q. Do you know who the signatory is?

A. No.

Q. Do you know what the subject matter of this refund claim is?

A. No.

Q. Do you recall a premerger issue that had risen for Browning-Ferris Industries, Inc. involving a Competent Authority proceeding?

A. Yes.

Q. Can you explain what that was?

A. Premerger BFI had a net -- let's see. A logo,

an overhead fee that they charged their various subsidiaries.

Q. What's a logo?

A. Just for the right to use the name.

Q. I see.

A. And that amount that was charged to the Canadian subsidiary was challenged by the Canadian tax auditors as being too high; and when you have an issue like that that involves the U.S. and Canada, it goes to what's called Competent Authority.

Q. Do you know when that Competent Authority proceeding was resolved?

A. I'm thinking.

It would have been resolved when we finished the 9-96 through 7-99 audit.

Q. When did that happen?

A. When we paid the 22 million or so of tax related to the 9-96 through 7-99 year, which would have been May '05ish.

Q. Let me help you pin that down.

A. Sure.

Q. Let's go to the next document.

We're up to 29.

(Deposition Exhibit No. 29 was marked for identification.)

BY MR. BASSIN:
Q. Does Exhibit 29 help you pin down the date on which the '96 to '99 audit was brought to a close?
A. Yes.
Q. Okay. And when was it brought to a close?
A. This letter is dated April 25th, 2005, which reflects the payments that were made for two of those premerger years.
Q. Does this help you pin down when it was that the controversy for those premerger years, at least as regards the portion that you were resolving with the Internal Revenue Service Appeals Office, was resolved?
A. The Competent Authority adjustments were, in fact, reflected in the net amount owed here of the 22.5 million.
Q. Well, maybe you can help me here. Was there a notice of deficiency issued?
A. I don't recall.
Q. Was there some document that came from the Internal Revenue Service after that -- at the close of this Competent Authority process and the dealings you had with Mr. Mastracchio that said, okay, we're done, here's what the IRS thinks BFI, Inc. owes?
A. Whether it was a notice of deficiency or something else, we obviously got something from the

service that indicated these were the amounts due for those respective tax years.

Q. I note in the first full paragraph of Exhibit 29, there's a reference to an attached Form 3610, which, unfortunately, wasn't attached to what was produced. Do you know what a Form 3610 is?

A. I don't.

Q. Do you know if any effort was made to find that Form 3610?

A. I don't know.

MR. BASSIN: Can we ask the plaintiff to go back to the files and see if the copy that they had and that they produced had the referenced attached Form 3610?

MR. KARTER: You want to see the attachment to this document?

MR. BASSIN: Right.

MR. KARTER: Well, we'll check to see if they can locate that attachment.

MR. BASSIN: Okay. Thank you.

BY MR. BASSIN:

Q. Were you dealing with Mr. Mastracchio?

A. Yes.

Q. Did you have counsel who had a power of attorney to deal with Mr. Mastracchio?

A. Yes.

Q. Do you know if Allied -- excuse me.
Do you know if there was a revised power of attorney prepared as of roughly January 1, 2005 to reflect the change from BFI, Inc. to BFI, LLC?
A. Restate your question, or just say it again, please.
Q. Do you know if there was a new power of attorney prepared as of January 1, 2005 to reflect the change from BFI, Inc. to BFI, LLC?
A. No, I don't know of one.
Q. Do you know if there was a Form 870-AD executed in connection with the dealings with the Appeals Office?
A. I don't recall.
Q. I'm just trying to figure out how we all ended up where we're at. Do you know?
A. I don't recall, no.
Q. Do you recall any other open disputes that BFI had with the Internal Revenue Service after January 1, 2005, other than the ERMI transaction?
A. State the question again, please.
Q. Do you recall any other open disputes that BFI had with the Internal Revenue Service after January 1, 2005 other than the ERMI transaction?
A. Are you referring to premerger years?
Q. Correct.

A. Yes, it was only ERMI that was open.
Let me correct it. At 1-1-05?
Q. Right.
A. We were still dealing with the Competent Authority issue.
Q. Okay. Let's shift gears a little bit.
Let's go back into the big binder, and let's go to Tab 5. Tell me what that document is.
A. Form 1120X, amended U.S. corporation income tax return for Browning-Ferris Industries, Inc. and subsidiaries.
Q. And that's your signature?
A. It is.
Q. And that refund claim is for September 30, 1997 fiscal year?
A. Correct.
Q. Exhibit 6 is a comparable amended return for the year ending September 30, 1998?
A. Correct.
Q. That's your signature?
A. It is.
Q. And Exhibit 7, that's a comparable return for the year ending July 30, 1999?
A. Correct.
Q. And your signature?

A. It is.
Q. And these documents were submitted to the Internal Revenue Service, Exhibits 5, 6 and 7?
A. Yes.
Q. And were they submitted on or about the date of your signature?
A. On or about.
Q. Until August 2005 -- or excuse me, until August 2006, had any question arisen regarding whether or not those claims were -- these documents, Exhibits, 5, 6 and 7, were adequate to satisfy the statutory claim for refund requirement as regards the ERMI transaction?
A. Simplify the question for me.
Q. Until August 2006, had any question arisen regarding whether or not the claims identified as Exhibits 5, 6 and 7 were adequate to satisfy the statutory claim for refund requirement with regard to the ERMI transaction issue?
A. That didn't sound any simpler.
Q. I took a couple of the qualifications out.
If you want to look at it, you can look at the screen and read it.
A. Let me answer it this way: Prior to August 2006, had there been any question about whether the claims were valid claims?

Q. Correct.
A. No.
MR. KARTER: Well put.
BY MR. BASSIN:
Q. Let's look at Exhibit 8 in the binder. Can you tell me what Exhibit 8 is?
A. It's a letter from Winston & Strawn addressed to Dominic Mastracchio.
Q. What role did Winston & Strawn have at the time that it wrote this letter?
A. They were our counsel.
Q. For the BFI premerger years?
A. Yes.
Q. In the first sentence of the second paragraph, it says that the claimant respectfully requests that the Service immediately reject this claim.
Did the Service actually do that, immediately reject?
A. I know they rejected it shortly. I don't know if that's immediately or not, but it wasn't very long.
Q. I would like you to look at Exhibit 16, and I'm particularly interested in -- excuse me. Let's go to Exhibit 18. I would like you to look at Page 40 and 41 of that document, and I'm particularly interested in the first sentence -- or the first paragraph on Page 41; and

this document is Allied's 10-K for the year ended December 31, 2005. And the question is, the first paragraph on Page 41 of Exhibit 18, does that refer to the litigation that is now pending in the Court of Federal Claims?

A. Yes.

Q. In the binders we also have additional refund claims at Tabs 9 through 14. Is it fair to say that there has been no action by or on behalf of the Internal Revenue Service with respect to any of those claims?

A. What are you thinking of?

Q. Well, has Allied heard or -- has Allied or BFI heard anything from the Internal Revenue Service that specifically relates to these claims?

A. To the refund claims, no.

Q. These are the August 2006 refund claims?

A. Correct.

Q. Let's switch gears a little bit here. Let's go back to Exhibit 29, and while we're here, let's also pull out Exhibit 19.

In Exhibit 19, on Page 3, under Topic d), we have a series of quotations that we're asking for the factual basis for each of these assertions, and we're going to work our way through those now. I think the first one dealing with payments being made in '97 and '98

is where we're going to start.

Is there any connection between those payments that are referenced in Paragraph d)1) of the notice of deposition and Exhibit 29?

A. Repeat the question?

Q. Is there any connection between the payments referenced in Paragraph d)1) and Exhibit 29?

A. They are the same amounts.

Q. Is Exhibit 29 the document showing that the payments referenced in Paragraph d)1) were made?

A. Yes.

Q. In Exhibit 29, on Page 3 there's a new name for me, AWIN Management, Inc. as the entity whose account this check was drawn on. What is AWIN Management, Inc.?

A. It's the cash management company for Allied.

Q. Can you explain what a cash management company is?

A. All cash transactions, checks being written, come out of AWIN Management.

Q. For Allied and the former BFI subsidiaries?

A. Allied and all of its subsidiaries.

Q. There's a handwritten notation on the third page of Exhibit 29 at the top, or at the top of the check. Can you read that?

A. The check itself?

Q. Yeah.
A. Yes. Do you want me to read it out loud?
Q. Please.
A. "9-30-97 tax year, Browning-Ferris Industries, Inc., FEIN 74-1673682."
Q. Do you know whose handwriting that is?
A. No.
Q. Do you know whose signatures those are?
A. Yes.
Q. Whose are they?
A. First one is James Gray, chief accounting officer at Allied. Bottom one is Thomas P. Martin, treasurer.
Q. That's obvious.
At the time, did BFI, Inc. or BFI, LLC have its own checking account?
A. Not that I'm aware of.
Q. Let's go to Paragraph d)2). It's a statement that on or about May 5, 2005, BFI, Inc. attempted to file refund claims for the consolidated taxable years 1997 and 1998 of the BFI Group.
Are those refund claims the documents identified as Tabs 5 -- Exhibits 5 and 6?
A. Yes.
Q. Now, were Exhibits 5 and 6 actually submitted to

the Internal Revenue Service?

A. My understanding, yes.

Q. Any reason to believe that they weren't?

A. No.

Q. The reference to "attempted to file," does that mean anything else -- well, do you know what the quotation, quote, attempted to file, unquote, is intended to mean?

A. I would think that it has something to do with the fact that Browning-Ferris Industries, Inc. did not exist at the time the refund claims were filed. That's why the word "attempted."

Q. Any other reason for the use of the word "attempted"?

A. No.

Q. The IRS accepted those claims as documents that were submitted by BFI?

A. Yes. To my understanding, yes.

They didn't accept the refunds.

Q. Of course. If they had, we wouldn't be here.

MR. KARTER: They can still change their mind.

MR. BASSIN: Oh, well, that's a good idea.

BY MR. BASSIN:

Q. The next statement we wanted to talk about is Paragraph d)3), where we say, "As a result of that

conversion, BFI, Inc. liquidated for tax purposes into BWNA in a transaction that qualified under Section 332 of the Code."

MR. KARTER: Just for clarification, I think it's AWNA.

MR. BASSIN: My apologies. A, B, C.

BY MR. BASSIN:

Q. Are we talking about a liquidation that happened as a matter of fact, or as a matter of law?

MR. KARTER: Object to form. I don't understand the question.

BY MR. BASSIN:

Q. Other than converting from BFI, Inc. into BFI, LLC under Delaware law, was anything done to effect a liquidation of BFI, Inc.?

A. Repeat it for me, please.

Q. Other than converting BFI, Inc. into BFI, LLC under Delaware law, are you aware of anything that was done to effect a liquidation of BFI, Inc.?

A. The conversion of BFI, Inc. into a single member LLC constituted a liquidation under Section 332 for tax purposes.

Q. But my question is a little bit different.

Are you aware of any action that anyone took, other than filing the conversion documents?

A. No.
Q. Let's look at Paragraph d)4). "BFI, Inc.'s existence as a common parent of the BFI Group had ended on December 31, 2004."
Now, did BFI, Inc. cease to exist as of that date?
MR. KARTER: Object to form. I mean you're asking a legal question.
BY MR. BASSIN:
Q. Okay. Let me ask you differently.
Did BFI, Inc. do anything other than convert to an LLC as of December 31, 2004 that supports this statement?
A. To my knowledge, the conversion occurred.
Q. Did anything else occur?
A. Not to my knowledge.
Q. Was there any transfer of assets that occurred for financial accounting purposes?
A. What do you mean by financial accounting purposes?
Q. If I were to study the accounting books and records of the combined Allied/BFI Group that are maintained for financial accounting purposes, would I find any evidence of this conversion?
A. The legal entity associated with the operations

of BFI would be shown in the books as BFI, LLC.

Q. As opposed to BFI, Inc.?

A. That's correct.

Q. And that's the only change that you're aware of?

A. Yes.

Q. Did the BFI Group actually take any action in December 31, 2004 to reflect the change of existence of BFI, Inc.?

A. You have to be more specific. Take any action?

Q. Is there some document that I can see dated on or around December 31, 2004 to reflect something that BFI Group did?

MR. KARTER: I have to object to the form. I can't make out what it is that you're asking.

BY MR. BASSIN:

Q. Is there some document that we can look at that shows some action taken by the BFI Group as of December 31, 2004 to recognize the ending of BFI, Inc.'s existence?

MR. KARTER: I guess my problem with your question is, you say "taken by the group." Are you encompassing in your question, for example, the 332 liquidation notice or the various documents that the prior deponent referred to?

BY MR. BASSIN:
Q. Okay. What I'm wondering is, there are a hundred entities that -- is it fair to say there were about a hundred-plus entities that were part of the BFI Consolidated Group?
A. I don't think there were -- I don't think there were over a hundred, no.
Q. Well, over 50?
A. Probably, yes.
Q. Did any of them do anything on or around December 31, 2004 in response to the conversion of BFI, Inc. into BFI, LLC?
A. Did the corporations do anything?
Q. Correct.
A. I'm having difficulty following where we're going here.
Q. Is there any document executed by any of those 50-plus members of the BFI Group, other than BFI, Inc. or BFI, LLC, on or around December 31, 2004 to reflect the conversion of BFI, Inc. into BFI, LLC?
A. In my role as VP of tax, I did not see anything like that.
Q. Thank you. In your role -- let's go to the last point, d)5). "In August of 2006, in the course of its own due diligence, current counsel for Allied discovered the

error and advised Allied to file corrected claims."
Are you the designee to talk about that point?
A. Yes.
Q. Okay. Can you tell me what happened?
A. There was a meeting early in August of this year with counsel. We were looking at a corporate organization chart. Counsel noticed that the organization chart, instead of showing BFI, Inc., showed BFI, LLC, and that was the genesis of what's happened since.
Q. Why were you looking at an organization chart?
A. I can't remember exactly why.
Q. What advice were you given?
MR. KARTER: Just hold on a second. I'm going to let him respond to that in the context of this specific allegation only. Obviously, beyond that, you're intruding on privileged communications. But that's been a representation that's been made by me in court and in our brief, so to the extent that he can respond with respect to this particular allegation, I'll permit it. Beyond that, I'll direct him not to answer.
MR. BASSIN: Okay. And our position is that there is some form of subject matter waiver that has occurred here.
MR. KARTER: Well, as long as it's on the same subject --

MR. BASSIN: Right.

MR. KARTER: -- he's permitted to answer the question.

MR. BASSIN: Okay.

BY MR. BASSIN:

Q. Can you explain what advice Allied was given?

A. That the filed refund claims were defective, in that they showed BFI, Inc. as the taxpayer, and we needed to designate a new agent and file revised refund claims.

Q. What was your reaction when you received that advice?

A. I don't know that I had a strong reaction.

Q. Wasn't asking for a strong reaction. What was your reaction?

A. Well, let me rephrase that. To the extent that we could have filed refund claims that were invalid and we're talking about the amount of money that we're talking about, then, of course, yes, I was concerned. So it would be a strong reaction and what do we need to fix the problem.

Q. Were you discussing the Coltec decision with counsel at roughly that time?

A. Discussions had been had on Coltec around that time, yes.

Q. The Appellate decision, as opposed to the Trial

Court decision?

A. Yes.

Q. Was there any discussion as to what options Allied might have if it filed additional refund claims or new refund claims?

MR. KARTER: Objection to form.

BY MR. BASSIN:

Q. Was there any discussion between you and counsel regarding options that filing new refund claims might create for Allied or for BFI?

MR. KARTER: Now we're really going beyond the scope of what this allegation or what this factual statement says. The question is one of fact, and what it asks is -- or what it refers to is the circumstances surrounding the discovery of the error, okay; and you've asked questions about that and I permitted him to answer those. But getting into discussions of legal strategies and whatnot, that intrudes on privilege which has not been waived, and I'm not going to permit him to answer those questions.

Now, I will say this: We have said -- and you can read it in the transcript in court, and it should come as no surprise -- that we are all of a like view on this side of the table that Coltec was an erroneously decided case; and obviously we've represented that to the Court.

But as for strategic discussions we had or implications of how that case might be analyzed or whatever, that is so far over the line, beyond what is reflected here, that I'm going to recommend and advise him not to respond.

MR. BASSIN: And the distinction that you're trying to draw between how the error was found and then questions that go beyond that would be fine if the statement was ended "at discovered the error." But then you go on and say, "and advised Allied to file corrected refund claims," and what I'm trying to get at is the entirety of the advice that was provided to Allied in the context of what to do with corrected refund claims.

MR. KARTER: I think he just testified to that. He said he was advised to file -- he was advised that new refund claims should be filed to cure the defect, and that's what was done.

MR. BASSIN: Now, the question -- my question was, did that conversation go beyond go file corrected refund claims?

MR. KARTER: We had a conversation, obviously. That conversation, beyond the scope of what's referenced here, is a privileged attorney-client conversation. Ask your specific question, and I'll let you know whether I find it objectionable.

BY MR. BASSIN:
Q. As part of the discussion regarding what Allied should do based upon the discovery of the error in the original refund claims, did the advice that Allied received also include discussion of the implications of filing new refund claims for the effect of the Coltec decision?
MR. KARTER: Well, if you could rearticulate the question. If you're asking about whether the Coltec decision is somehow behind all this; is that your question?
MR. BASSIN: No. My question to the witness is, was there any connection -- off the record.
(An off-the-record discussion ensued.)
BY MR. BASSIN:
Q. My question to the witness is, was there any connection between the discussion of the need to file corrected refund claims and the implications of the Coltec decision upon the likelihood of success in the litigation?
MR. KARTER: I mean that's a poorly worded question, if you don't mind me saying. I mean it's a compound question. Let's see if we can put it in a way that he can answer.
If you're asking whether the Coltec -- the outcome in the Federal Circuit regarding Coltec was what

drove the decision to file corrected claims to cure the defect, he can answer that question, if that is your question.

MR. BASSIN: Well, you helped me with the articulation here. Let me see.

BY MR. BASSIN:

Q. Was the outcome of the Federal Circuit decision in Coltec discussed in the context of whether corrected refund claims should be filed?

MR. KARTER: You can answer that question.

THE WITNESS: Repeat it again.

BY MR. BASSIN:

Q. Was the outcome of the Federal Circuit's decision in Coltec discussed in the context of whether corrected refund claims should be filed?

MR. KARTER: Let me just clarify before I agree to allow him to answer. You are, I think, asking the same question that I just posed, which is whether the Coltec decision was what bore on the decision to file corrected claims to cure the jurisdictional defect.

MR. BASSIN: There is a distinction between your question and my question.

BY MR. BASSIN:

Q. My question is, was Coltec discussed in the context of Allied's decision to file corrected refund