claims?

MR. KARTER: See, the problem with your question is, Coltec is a case that has direct bearing on this case as it stands now, and it should come as no surprise that the Coltec decision, in this room and in many other rooms for contingent liability cases, has been discussed between counsel and client; and it's not clear to me whether you're trying to link up whether that was the impetus for filing these refund claims or not. Because you can ask that question, but to say was it discussed in the context of is simply asking in the course of an attorney-client conversation that involved these refund claims, did you also talk about the Coltec case. I don't even know that he can answer that, because Coltec has been talked about throughout this case.

BY MR. BASSIN:

Q. Well, let's try it a different way.

In the context of obtaining advice regarding whether Allied should file corrected refund claims, did Allied and its counsel discuss Coltec and its implications?

MR. KARTER: Well, once again, now, is your question whether the discussion of Coltec was material to filing refund claims or simply whether it was discussed in that particular conversation?

MR. BASSIN: Whether it was discussed in that particular conversation.

MR. KARTER: You can answer that, if you remember.

THE WITNESS: I don't remember whether we were discussing Coltec at the same time that counsel identified the problem with BFI, Inc.

BY MR. BASSIN:

Q. No, but I think you're misunderstanding my question.

When you were deciding what to do, having discovered the problem, did you also discuss the implications of Coltec as part of obtaining that advice?

MR. KARTER: I think that sounds to me like the same question he just responded to. When you say "when you were deciding what to do," he's testified that there was a conversation where counsel became aware that a company that had filed refund claims no longer existed, and at that point in time, that's what he's testified as to what the conversation was.

Now, when you say "when you were deciding what to do," that involves a span of time.

MR. BASSIN: Well, okay.

MR. KARTER: So you're going to have to, again, focus your question so he can determine whether he can

answer it or not.

BY MR. BASSIN:

Q. Was there a span of time between the first indication that there was a problem with the refund claims because of the conversion of BFI, Inc. into BFI, LLC and the time when the plaintiff decided to file new refund claims?

MR. KARTER: So your question now is from the time that it was first discovered, did they decide to file refund claims right then and there, or did some time elapse between the decision to file?

MR. BASSIN: Absolutely.

MR. KARTER: Okay. You can answer that.

THE WITNESS: We decided to file refund claims then, because we were concerned about the fact that the refund claims that we had filed were defective.

BY MR. BASSIN:

Q. In the same conversation, that same day that you first discovered that BFI, Inc. --

MR. KARTER: If you remember.

BY MR. BASSIN:

Q. -- had converted to BFI, LLC?

A. Help me again with your question.

Q. Did you decide to file new refund claims in the same conversation, as part of the same conversation

occurring on the same day that you discovered that BFI, Inc. had already converted into BFI, LLC?

MR. KARTER: Decide right then and there to file refund claims?

MR. BASSIN: Right.

BY MR. BASSIN:

Q. Or was there some passage of time?

A. No, we decided right there and then, because the concern was, we had refund claims that weren't valid.

Q. You immediately knew that when the conversion was discovered, that you had to file new refund claims immediately?

A. Counsel advised that we didn't have valid refund claims, so of course.

Q. Did counsel do any research between discovering that there had been a conversion and advising you that the refund claims were invalid?

MR. KARTER: I mean you're asking him what another party did. Whether he knows or not --

MR. BASSIN: Well, I gather what he's saying is that as soon as it became clear to both of you that BFI, Inc. had converted to BFI, LLC prior to the filing of refund claims by BFI, Inc., you immediately knew that there was a problem; that the refund claims might not be valid.

MR. KARTER: Well, that's a different question than the one you asked before.

You can answer that question. That's different than asking whether we decided at that exact moment to file refund claims.

THE WITNESS: Was advised that the refund claims were defective.

BY MR. BASSIN:

Q. Immediately, within minutes after --

A. I don't know if it's minutes or --

Q. Days?

A. No, it was in that initial conversation that we decided to do that. Again, the concern was, we didn't have valid refund claims out there; and in my role, that was a big concern. We had to correct that problem.

Q. And you and counsel were able to determine that there weren't valid refund claims almost immediately after you put together the two facts that there had been a conversion and the refund claims were filed in the name of the old entity?

A. State it again.

Q. You and counsel were able to determine almost immediately that the refund claims might not be valid because -- excuse me, when you learned -- let me start again.

You and counsel were able to determine almost immediately that the refund claims might not be valid --

MR. KARTER: Well, Stu, first of all, let him speak for himself. He can't testify for what was in counsel's mind unless it was expressed in a conversation; and if it's limited to the scope of this paragraph, I'll let him talk about it. He can only testify as to what he knew, okay.

MR. BASSIN: Okay.

THE WITNESS: When I was told that the refund claims might not be valid, we had to correct it, we had to take action.

BY MR. BASSIN:

Q. And my question is, was there any time lag between the time that you realized that BFI -- you and counsel realized that BFI, Inc. had converted into BFI, LLC and the realization that the refund claims might not be valid?

A. Repeat the question.

Q. Was there any time lag between the time that you realized -- well, that you and counsel realized that BFI, Inc. had converted into BFI, LLC and you realized that the refund claims might not be valid?

MR. KARTER: Wait. Hang on. Again, you've got to be more precise with your questions. "When you and

counsel realized." He's testified earlier that obviously he was the one who had recommended a conversion. So you can't group the two of us together. What's in this paragraph reflects counsel's discovery in August of 2006 of something it had previously been unaware of, okay.

So you'll have to parse the questions. I'll do my best to try to make sense out of them, but you have to be more careful in articulating the precise question.

BY MR. BASSIN:

Q. Let's continue to work through this, okay. Let's see if I can get the chronology first.

The first thing that happens is that counsel asks you where's BFI, Inc. on this organizational chart?

MR. KARTER: Is that a question?

BY MR. BASSIN:

Q. Is that the first thing that happened, roughly speaking?

A. Roughly speaking.

Q. And then the next thing that happens -- that happened was, you indicated that BFI, Inc. had converted into BFI, LLC?

A. Roughly speaking.

Q. Okay. What happened next?

A. We were advised, I was advised, that those refund claims might not be valid.

Q. And how much time lag was there between your receiving that advice and the time that you indicated that BFI, Inc. had converted into BFI, LLC?

A. Same conversation.

Q. Minutes?

A. Yeah.

Q. Were there any follow-up conversations on the subject of whether the original refund claims might be valid?

A. I'm sure there were subsequent discussions with counsel. Again, I was advised that they might not be valid, so I'm sure counsel went back and confirmed that.

MR. BASSIN: Let's take about two minutes here.

(A recess was taken.)

BY MR. BASSIN:

Q. Let's go back on the record.

Looking at Exhibits 9 through 14, we see that the new claims were filed August 22. How long was it between the conversation where you decided that new refund claims had to be filed and the time that those refund claims were submitted?

A. As for how many days, is that your question?

Q. Yeah.

MR. KARTER: Just to be sure that his testimony is being characterized correctly, and you can check your

Livenote, but what he testified to, as I recall, was that concerns were raised at that meeting and then counsel went back to confirm his concerns.

So the question you just asked now is that when you decided, implying that the decision was made right at that moment.

MR. BASSIN: Oh, okay.

MR. KARTER: So just state your question again, and I'll try not to interrupt you, but I want to make sure we don't mischaracterize his testimony.

MR. BASSIN: And I misunderstood something there.

BY MR. BASSIN:

Q. Are there three events that -- let's see if we can try to put dates on these things.

Do you know when you had that first conversation with counsel about there's a potential problem with the original refund claims?

A. The first week, ten days of August.

Q. And we know that the refund claims were filed August 22nd.

A. Correct.

Q. What happened in between?

A. With regard to?

Q. With regard to whether -- what to do with the

new knowledge that there was a potential problem with the original refund claims.

A. Counsel confirmed that there was a problem with the original refund claims, and we proceeded to correct them.

Q. So there's another conversation that takes place in that period?

A. A confirmation of the concern that was initially raised in that first part of August meeting.

Q. Oral or written?

A. I just remember it being oral.

Q. And the advice that you were given was -- what advice were you given regarding the likelihood that the original refund claims would be found to be invalid?

MR. KARTER: Are you asking him to assign a percentage when you say "what advice were you given"?

MR. BASSIN: Yes.

MR. KARTER: If you were given advice to that effect. Because you're assuming that he was told the claims have a certain likelihood of being invalid or what. If you can answer the question.

THE WITNESS: I don't remember being told a percentage or anything like that.

BY MR. BASSIN:

Q. Were you told that there was a possibility that

those refund claims might be considered valid?
MR. KARTER: Valid or invalid?
MR. BASSIN: Valid.
THE WITNESS: All I remember is that there was concern that the refund claims were invalid, so we took action.
BY MR. BASSIN:
Q. And was there any discussion of the precedential implication of Coltec during this period between when you -- early August, when you found the potential problem, and August 22nd, when you filed the refund claim?
MR. KARTER: If your question -- if you're asking the question with regard to whether that bore on the decision to file the claims, then that's within the context of Paragraph 5.
MR. BASSIN: Okay.
MR. KARTER: If you're asking about discussions regarding Coltec in general, then that would be beyond the scope of Paragraph 5.
BY MR. BASSIN:
Q. Was there any discussion of the precedential implication of Coltec during the period from early August, when you found the potential problem, and August 22nd, when you filed the refund claims, which bore on the analysis of whether or not to file new refund claims?

MR. KARTER: That question you can answer.

THE WITNESS: The refund claims would have been filed with or without Coltec's being in the picture, if you will.

BY MR. BASSIN:

Q. But my question was different than that.

Was there any discussion of the precedential implication of Coltec during the period from early August through August 22 which bore on your analysis of whether or not to file new refund claims?

A. No. We filed the refund claims because we were concerned they were invalid, the ones that we had previously filed.

Q. And there was no discussion of Coltec's precedential implications during the period when you were deciding whether or not to file new refund claims?

MR. KARTER: Wait a second. Okay, now --

BY MR. BASSIN:

Q. In the context of whether to file refund claims, new refund claims.

MR. KARTER: Okay. Now you can answer.

THE WITNESS: We filed the refund claims because we were concerned that the existing ones were invalid.

BY MR. BASSIN:

Q. But that's not my question.

Is it your testimony that there was no discussion of Coltec's precedential implications during the period when you were deciding whether or not to file the refund claims, in the context of whether or not to file new refund claims?

MR. KARTER: Do you understand what the question is?

Let me try to state it for you, and if you want to correct it --

MR. BASSIN: Please do.

MR. KARTER: Were there any discussions about the effect of Coltec that bore on the decision whether or not to file these refund claims?

Is that what you were trying to say?

MR. BASSIN: Yes.

THE WITNESS: No. The refund claims would have been filed, as I said.

BY MR. BASSIN:

Q. And nobody discussed the implication of Coltec --

MR. KARTER: You keep asking the same question and he keeps answering it.

MR. BASSIN: No, he keeps saying -- he's answering a slightly different question, which is, we would have done it anyway; and what I'm asking is --

MR. KARTER: But he also answered --
MR. BASSIN: -- did you discuss it at all.
MR. KARTER: With regard to whether the refund claims would be filed?
MR. BASSIN: That's correct.
MR. KARTER: Okay. I think he's answered that question three times.
But you can answer it again.
THE WITNESS: We filed the refund claims because we were concerned that the existing ones --
MR. KARTER: I think maybe you can give him the answer that he's expecting if you just respond yes or no, because he asked you whether there was a discussion that related to the decision to file the claims or not, and I think the answer can be responded to as a yes or no answer, and I think that's what he's looking for.
MR. BASSIN: Right.
THE WITNESS: The answer would be no, we didn't file the claims because of Coltec.
BY MR. BASSIN:
Q. Did you consider Coltec at all in the context of deciding whether or not to file new refund claims?
MR. KARTER: Do you mean, when you say "did you consider," do you mean did he consider himself or did he discuss it with counsel?

BY MR. BASSIN:

Q. Well, no, did -- well, did Allied -- or did BFI consider Coltec at all when it was deciding whether or not to file new refund claims?

MR. KARTER: So you're asking him about his own considerations?

MR. BASSIN: Right.

MR. KARTER: Not what he discussed with counsel?

MR. BASSIN: Correct.

THE WITNESS: Repeat the question.

BY MR. BASSIN:

Q. Did BFI consider --

MR. KARTER: BFI. What do you mean by BFI? BFI is a corporation. I mean we're talking about individuals here. Corporations don't consider.

BY MR. BASSIN:

Q. Okay. Well, did you consider Coltec when you were deciding whether or not to file corrected refund claims?

MR. KARTER: You personally.

THE WITNESS: No.

BY MR. BASSIN:

Q. Didn't even cross your mind?

A. With regard to the decision of whether to file?

Q. Yeah.

A. No.
Q. Okay. Can you explain why plaintiff filed a set of refund claims in the name of BFI, LLC?
A. As I understood it, it was a protective measure in case BFI, LLC was determined to be the proper one to have filed them.
Q. And why was a set filed in the name of BFI Waste Systems?
A. Of North America?
Q. Yeah.
A. Because we had submitted the designation statement in BFI North America's name.
Q. I think one last topic here.
Mr. Parker, did you review the complaint in this case before it was filed?
A. I didn't read it page by page, no.
Q. Were you provided a copy?
A. Yes.
Q. Were you asked for comments?
A. As I recall, yes.
Q. Were any of the comments that you had given not incorporated in the final draft?
A. No.
MR. BASSIN: I'm done.
MR. KARTER: No questions.

THE WITNESS: I do want to correct one statement.
BY MR. BASSIN:
Q. Please.
A. You had phrased the question did Coltec cross my mind. Why don't you restate that question for me.
Q. Did Coltec cross your mind when you were considering whether or not to file new refund claims?
A. Let me correct my response and saying it crossed my mind, but we would have filed the refund claims anyway.
Q. Now, in what way did it cross your mind?
MR. KARTER: If you can recall.
THE WITNESS: I'm thinking.
BY MR. BASSIN:
Q. Go ahead, take your time. I'm just cleaning up.
A. It crossed my mind from the standpoint of whether that would make the complaint that we had filed in the Federal Court of Claims invalid.
Q. Did anything else cross your mind with regard to Coltec?
A. The fact that there had been an unfavorable decision in Coltec?
Q. Yeah.
A. Yes. But, again, we would have filed those refund claims regardless.

Q. Did you take the knowledge that there was an unfavorable decision in Coltec and the fact that there was a refund suit pending in the Federal Court -- the Court of Federal Claims any further in your mind to decide whether there was any significance -- let me strike. Let me start again.

MR. KARTER: I'm glad we're waiving relevancy objections.

BY MR. BASSIN:

Q. Did you draw any further significance from the fact that there was a complaint pending in the Court of Federal Claims and that there was the taxpayer unfavorable decision in Coltec?

A. Say it again, please.

Q. Did you draw any further significance from the fact that there was a complaint pending in the Court of Federal Claims and that there was the unfavorable -- the taxpayer unfavorable decision in Coltec?

A. Any further significance, I don't know what you mean.

Q. In your thought process.

A. I've testified that it was in my thought process, and then I've testified we would have filed the refund claims regardless. I don't know what else I can say.

Q. Did you consider, as part of this thought process, that it might be a good thing not to be in the Court of Federal -- not to have the ERMI litigation prosecuted in the Court of Federal Claims, in light of Coltec?

A. Of course.

Q. Did you connect the fact that potentially invalid claims might be a vehicle to have the ERMI litigation prosecuted outside the Court of Federal Claims?

A. Yes.

Q. Did you discuss that with counsel the possibility that potentially invalid claims might be a vehicle to have the ERMI litigation prosecuted outside the Court of Federal Claims?

A. Isn't that beyond the scope?

MR. KARTER: You can answer the question if you know.

THE WITNESS: Yes.

BY MR. BASSIN:

Q. What advice did counsel give you?

MR. KARTER: Objection.

MR. BASSIN: Are you going to instruct not to answer there?

MR. KARTER: Yes.

MR. BASSIN: Nothing further.

MR. KARTER: We're going to reserve reviewing and signing the deposition. Elaine's we'll pass on signature.

MR. BASSIN: One last thing on the record. We have a response due to the Court on November 3rd. If there are going to be any significant changes in Mr. Parker's testimony, we need to know about it before that.

MR. KARTER: Sure. What do we have -- well, let's figure out when he's going to have the transcript. I mean he's got to have a chance to review it.

Can we go off the record so she can advise us as to when the transcript will be available?

MR. BASSIN: Okay.

(The deposition concluded at 12:41 p.m.)

__________________________________
DALE PARKER, CPA

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken before me, JODY L. LENSCHOW, Certified Reporter No. 50192 for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction; that a review of the transcript by the witness was requested; that the foregoing pages contain a full, true, and accurate transcript of all proceedings and testimony had, all to the best of my skill and ability.

I FURTHER CERTIFY that I am not related to nor employed by any of the parties hereto and have no interest in the outcome thereof.

DATED at Phoenix, Arizona, this 30th day of October, 2006.

Jody L. Lenschow

JODY L. LENSCHOW, RMR, CRR
Certified Reporter
Certificate No. 50192

**CERTIFICATE**

I hereby certify that the transcript of my deposition is a true and accurate record of the testimony given by me, subject to the additions or corrections set forth on the attached Errata Sheet. Pursuant to Federal Rule 30(e), the reasons for substantive changes to the transcript are noted.

[signature]
Name

11/15/06
Date

23295.2

# DALE PARKER
# ERRATA SHEET

I wish to make the following changes or corrections to my deposition:

| Page | Line | Description |
|---|---|---|
| 10 | 15 | Change "Tray" to "Trey" |
| 12 | 9 | Change "Jeff Stair" to "Geoff Stayer" |
| 13 | 4 | Change "Terri" to "Teri" |
| 13 | 5 | Change "Ann" to "Anne" |
| 13 | 14 | Change "Terri" to "Teri" |
| 14 | 5 | Change "Ann" to "Anne" |
| 29 | 17 | Change "they" to "there" |
| 44 | 3-18 | In response to counsel's request that we produce the Form 3610, attachment to Exhibit 29, a copy of such form is attached. |
| 65 | 14-15 | Change "to file refund claims then" to "to have counsel research the validity of the refund claims"<br><br>*REASON: Testimony at pp. 65-69 reflected some confusion regarding this line of questions. The testimony on these pages should be corrected as necessary in order to reflect that, at the time counsel first discovered the conversion of BFI, Inc. into BFI LLC, counsel advised us that there was a potential issue regarding the validity of our refund claims and, as a result, we decided immediately to have counsel research this issue. This corrected testimony is consistent with the testimony on pp. 70-72.* |

| Form 3610 (Rev. March 1986) | Department of the Treasury -- Internal Revenue Service Audit Statement | | Symbols AP:FW:HOU:DM:SJC |
|---|---|---|---|
| Name of Taxpayer Browning-Ferris Industries, Inc. | | SSN or EIN 74-1673682 | Date Prepared 04/06/05 |
| Kind of Tax Income | | | Docket Number |

| Tax Period Ended | DEFICIENCY (OVERASSESSMENT) (Increase or decrease in Tax and Penalties) | | | | |
|---|---|---|---|---|---|
| | TAX | IRC SECTION 6662 | | | |
| 9/30/1996 | (1,014,022) | - | | | |
| 9/30/1997 | 19,079,286 | - | | | |
| 9/30/1998 | 3,519,979 | - | | | |
| 7/31/1999 | None | None | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

[X] Interest for 199609, 199709 & 199809 will be computed under sections 6611(f) & 6601(d) of the Internal Revenue Code.
*(Year)*

[X] Interest for 9/30/96 is subject to the General Agreement on Tariffs & Trade.

[X] Interest for 9/30/97 will be computed under Rev. Rul. 99-40 (Sequa). See form 2220 for 9/30/98.

[X] Interest for 9/30/96 & 9/30/97 is subject to the provisions of IRC Section 6621(c ). The applicable date will be determined based upon the Revenue Agent Report dated 9/03/2002.

Disk Id: BFIAppADJUSTS.XLS, BFIFTC96, BFIFTC97-2, BFIFTC98, BFIAppSettlement.CT